UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :
LATIN AMERICA FINANCE GROUP, INC. and    :
WILLIAM VAN DIEPEN,                       :
                                         :        04 Civ. 10082 (DLC)
                    Plaintiffs,          :
                                         :        OPINION & ORDER
          -v-                            :
                                         :
CARLOS PAREJA and PAREJA Y ASOCIADOS,    :
                                         :
                    Defendants.          :
                                         :
----------------------------------------X

Appearances:

For plaintiffs:
David J. Hoffman
Attorney at Law
29 Broadway
27th Floor
New York, NY 10006

For defendants:
Kathleen M. Kundar
JooYun Kim
Fox Horan & Camerini LLP
825 Third Avenue
New York, NY 10022


DENISE COTE, District Judge:

     Plaintiffs Latin America Finance Group, Ltd. ("LatFin"), a

strategic advisory firm, and William A. van Diepen ("van

Diepen"), LatFin's president, bring this action to recover money

they claim they are owed in connection with the attempted sale of

electrical assets in Ecuador.  They are not, however, suing the

party that they believe owes them money.  Instead, they have

chosen to bring claims for malpractice, breach of contract, and

breach of fiduciary duty against Dr. Carlos A. Pareja ("Pareja"),

an Ecuadorian lawyer involved in the transaction, and his law

firm, Pareja y Asociados.  What makes this choice of defendants perplexing is that Pareja was not hired by plaintiffs, was not paid by plaintiffs, and never did any work for plaintiffs. Moreover, the document whose legal defects purportedly left plaintiffs unable to collect their fees was drafted and filed by lawyers who were wholly unaffiliated with Pareja and his firm months before Pareja had any involvement with the transaction. In short, plaintiffs' claims are so entirely without merit that the only possible conclusion is that this litigation was undertaken in bad faith.

Background

Plaintiffs filed their complaint on December 21, 2004.  On February 7, 2005, defendants filed a motion to dismiss the complaint on the grounds of insufficient service, lack of personal jurisdiction, failure to state a claim, and forum non conveniens.  At a conference on April 29, the motion was denied.

The trial was conducted on July 17 and 18, 2006, without objection in accordance with the Court's customary practices for the conduct of non-jury proceedings.  The parties submitted a Joint Pretrial Order and proposed findings of fact and conclusions of law on May 3.  The parties also served affidavits containing the direct testimony of their witnesses, as well as copies of all the exhibits and deposition testimony that they intended to offer as evidence in chief at trial.

With its Pretrial Order submissions, plaintiffs presented

2

declarations constituting the direct testimony of van Diepen and Peter Heberling ("Heberling"), a managing director of LatFin and the trustee of Progreso Depositors Trust ("PDT") for most of the relevant period. Plaintiffs also submitted expert reports from Alejandro Ponce-Martinez ("Ponce"), an Ecuadorian lawyer; and business executives Juan Carlos Roa and Carlos MacWilliams. Van Diepen and Heberling were cross-examined at trial. Defendants offered declarations from Pareja; Francisco Swett ("Swett") and Glenn Goldhagen ("Goldhagen"), board members of the companies owned by PDT; and Deborah Das, a paralegal at Fox Horan & Camerini LLP. They also offered expert reports from Gerardo Vasquez Morales ("Vasquez"), an Ecuadorian lawyer and a former justice of the Supreme Court of Justice of Ecuador; Juan Carlos Peralvo, an Ecuadorian lawyer; and Mario A. Hansen-Holm, an Ecuadorian economist. Pareja, Swett, Goldhagen, and Vasquez were cross-examined at trial.

Excerpts from the depositions of most of the testifying witnesses, as well as the following individuals, were offered and received into evidence at trial. Plaintiffs submitted excerpts from the depositions of Richard Bruns ("Bruns"), trustee of PDT from May to July 2003; Enrique Garcia Holmes, receiver for the failed Banco del Progreso ("BP"); and Alberto Hernandez ("Hernandez") and Carlos Loumiet ("Loumiet"), both Miami lawyers who consulted on the transaction at issue here. Defendants offered excerpts from the depositions of Bruns; Hernandez; Holmes; Loumiet; David Castro Alarcon ("Castro"), former counsel

3

to Empresa Electrica del Ecuador, Inc. ("EMELEC"); Anna Maria
Perez, an Ecuadorian lawyer involved in the administration of
mercantile trusts; and Patricio Molina Davila, the general
manager of Ecuador's Agency of Guarantee of Deposits ("AGD").


### FINDINGS OF FACT

The following constitutes many of the Court's findings of
fact.  Additional fact finding appears during the presentation of
the Conclusions of Law.

This dispute arises out of the Ecuadorian banking crisis of
the late 1990s.  One of the banks that failed during this time
was BP, which was owned by Fernando Aspiazu ("Aspiazu"), the
former finance minister of Ecuador.  On February 15, 2000,
shortly before BP's collapse, Aspiazu placed certain assets into
PDT.  Among these assets were all the capital of North Eastern
Power and Energy Corporation ("NEPEC").  NEPEC, in turn, owned
all the capital stock of Electroecuador, Inc. ("Electroecuador")
and EMELEC.  Electroecuador produces power for the Guyuaquil
region, and EMELEC distributes it.  Neither company, however, is
Ecuadorian: Electroecuador was originally organized under the
laws of the Bahamas and then re-domiciled under the laws of
Delaware; EMELEC is organized under the laws of Maine.

Pursuant to an agreement with AGD -- the Ecuadorian
government agency established to pay depositors of failed banks -
- PDT's mandate was to sell EMELEC and Electroecuador and to

distribute the proceeds to the former depositors of BP.
Heberling, an American corporate attorney, was appointed trustee
of PDT.  In addition to his role as trustee, Heberling was a
friend of van Diepen's from college and a managing director of
LatFin -- a Delaware corporation that represents and advises
American and Latin American companies in mergers, acquisitions,
joint ventures, and principal investing.  Although he was not a
shareholder of the company, Heberling participated as a "fifty-
fifty partner" with van Diepen on projects in which he was
involved.  During the time pertinent to the events at issue here,
the boards of directors of EMELEC, Electroecuador, and NEPEC were
comprised of van Diepen, Swett, and Goldhagen.  Swett, a former
minister of finance to the president of Ecuador, served as
chairman of each board.  At the direction of Heberling, Swett
also acted as treasurer of PDT.[1]

On February 18, 2000, LatFin signed an agreement with NEPEC
whereby LatFin was to act as the financial advisor for the sale
of NEPEC, EMELEC, and Electroecuador.  LatFin, a Delaware
corporation, was to be paid $25,000 a month for its services and
was to receive a percentage of the value of the assets sold, up
to $12 million.  Just one week later, Heberling increased
LatFin's retainer to $85,000 monthly through a letter agreement.
In March 2000, the political landscape surrounding the sale of
the assets changed, as the government of Ecuador took physical

_____

[1] Although plaintiffs repeatedly claim that Swett had "no
role" in PDT, Heberling, one of plaintiffs' witnesses, testified
that all of PDT's funds "were under the control of Mr. Swett."

possession of EMELEC and took control of most of its funds.  On
March 23, Consejo Nacional de Electricidad ("CONELEC") -- the
Ecuadorian government agency that regulates Ecuador's electric
sector -- passed Resolution 34, which installed a temporary
administrator at EMELEC to handle the distribution of electric
power and provided that there be a public bidding for the
concession to provide electricity to Guayaquil.  Recognizing that
the public bidding process might eliminate any opportunity for
LatFin to receive a success fee for a sale of NEPEC's assets,
Heberling entered into new agreements with LatFin in June 2000
(the "Electroecuador Letter" and the "EMELEC Letter") that
provided for even greater monthly fees.[2]

Over the course of the next few months, it became
increasingly clear that the Ecuadorian government was planning to
go ahead with the EMELEC sale without the involvement of PDT.  In
October, Heberling, van Diepen, and Goldhagen went to Washington,
D.C. to consult with lawyers from the firm of Greenberg Traurig,
LLP.  During these meetings, the group discussed the possibility
of executing a security interest on the EMELEC assets to help
protect PDT's control of the assets and to assist in getting
LatFin's fees paid under the June 2000 agreements.  This option
was again discussed in November 2000, when Swett met with van
Diepen, Heberling, and Goldhagen in Florida.  Castro, EMELEC's

_____

[2] Of course, because of his arrangement with van Diepen,
Heberling was operating under an acute conflict of interest in
"negotiating" these fee agreements on behalf of PDT, as he stood
to profit equally with van Diepen from any increase in the
payments being made to LatFin.

in-house counsel, then drafted a security interest (the "Security Interest"), with assistance from PDT's lawyers at the Miami office of Greenberg Traurig.  Neither Castro nor Greenberg Traurig is affiliated with Pareja or Pareja y Asociados, and there is no credible evidence that Pareja was aware of, let alone involved in, the drafting of the Security Interest.  This document had two purported functions: (1) It gave PDT and LatFin a lien on the assets of EMELEC, and (2) it transferred to PDT and LatFin an irrevocable power of attorney over EMELEC.  It contained a Florida choice-of-law provision, and van Diepen testified that he understood it was to have been filed in Florida, but never was.  It was signed by Castro on behalf of EMELEC on January 3, 2001.  And on January 9, it was signed by Heberling as PDT trustee and van Diepen as president of LatFin.

There is some dispute as to whether the Security Interest could ever have been enforceable under Ecuadorian law. Defendants contend that Ecuadorian law prohibits liens on assets, such as electric utilities, that are used in the public service. Plaintiffs contend that, to the extent such a prohibition exists, it does not cover assets related to electricity services.  It is not necessary to reach this issue since, as explained below, no attorney-client relationship existed between plaintiffs and defendants.  In any event, there was enough concern about the enforceability of the Security Interest that, after Castro had registered the document with a notary public in Ecuador, he asked an Ecuadorian judge to rule on the validity of the document, but

highlighted <u>only</u> the portion regarding the power of attorney.  On January 22, the judge ordered the Commercial Registrar of Guayaquil to register the document.  On January 29, the Registrar did so, noting that the court had authorized the filing of the power of attorney.  But the entire document -- including the Security Interest -- was filed.

Through the drafting of the Security Interest and its "virtual" filing, van Diepen and the others who participated in the creation of the Security Interest were attempting to make it <u>appear</u> like a legally enforceable lien on the assets of EMELEC.  In this way, they hoped to cow potential buyers into negotiating with LatFin and PDT (thereby securing for themselves a portion of the proceeds of any sale), rather than allowing them to deal solely with the Ecuadorian government.  Indeed, van Diepen termed it a "poison pill" that would give LatFin increased leverage in the event of a sale.

Pareja's first involvement with the events at issue here did not come until at least two months later, when Swett called him to ask for advice relating to PDT's problems with CONELEC and AGD.  As a lawyer practicing in Ecuador since 1979, and as a former secretary to the president of Ecuador, Pareja was seen as possessing particular expertise both with regard to the substance of Ecuadorian law, and to negotiations with the various governmental entities involved with the proposed sale.  (Pareja is not licensed to practice law in the United States.)  Swett proposed that PDT engage Pareja to work on Electroecuador and

EMELEC's issues with the Ecuadorian government.

In mid-April 2001, Pareja signed an engagement letter, which was back-dated to April 1 to reflect the work Pareja had already performed (the "April 1 Letter"). Swett drafted the April 1 Letter and testified that he did not intend it to result in Pareja being engaged by LatFin. This understanding is supported both by the text of the Letter and the circumstances of its execution. Although the Letter was printed on LatFin letterhead and van Diepen signed it as president of LatFin, the Letter noted that LatFin was "represent[ing] The Progreso Depositors Trust" and offered to "engage [Pareja], on behalf of PDT, for the legal services set forth below." (Emphasis supplied.) Furthermore, van Diepen signed the April 1 Letter in the United States, while Pareja signed it in Ecuador. In fact, van Diepen and Pareja did not meet until December 2001 -- nearly eight months later.

The agreement enumerated 12 services that Pareja was to provide:

1. be retained as outside legal counsel to PDT in the resolution of outstanding [EMELEC] and Electroecuador matters as determined by the Trustee and his representative;
2. defend at all times PDT's interests, and help secure the fulfillment of its mandate;
3. advise the LatFin and PDT American legal teams on matters pertaining to Ecuadorian law;
4. participate together with the American lawyers in negotiations with CONELEC and AGD/Banco del Progreso leading to Agreements for the sale or transfer of the assets or shares of [EMELEC];
5. participate in negotiations with prospective foreign or local buyers of the assets or shares of [EMELEC];
6. carry out the same professional activities identified under numerals 4 and 5 on behalf of Electroecuador;

7. <u>advise PDT</u> in any and all legal actions in which
   [EMELEC] or Electroecuador are parties (plaintiff
   or defendant);
8. advise on matters relating to the current and future
   commercial relationship between [EMELEC] and
   Electroecuador;
9. participate in negotiations to resolve the matter of
   the mutual accounts ("cruce de cuentas") between
   [EMELEC] and the Government;
10. <u>advise PDT</u> and the management of Electroecuador in
    all matters pertaining to the defense of its
    interests;
11. represent the Companies' interests, positions,
    arguments with respect to potential tax
    liabilities; and
12. all such other assignments as may from time to time
    be required by the Companies, LatFin, or PDT.

(Emphasis supplied.)  The April 1 Letter made no reference to the
Security Interest.

In exchange for his work on these deals, Pareja was to
receive $25,000 a month from EMELEC and another $25,000 a month
from Electroecuador.  Upon the sale of either company's assets,
he was to be paid a success fee of $750,000.  The payments were
to be made by Swett "as the agent of LatFin and of its
administered fund, after review by the Trustee of PDT."  The
"administered fund" was a reference to PDT.  The parties agreed
that the letter would be governed by the laws of New York State,
and that federal and state courts in New York would have
exclusive jurisdiction over any suit arising out of the
agreement.

On July 17, 2001, after negotiations in which Pareja
participated, CONELEC softened its position with respect to PDT's
rights in EMELEC, entering into an agreement (the "CONELEC
Agreement") with PDT to allow CONELEC to use the EMELEC assets in

10

exchange for a $450,000 monthly payment to PDT and to give PDT access to certain EMELEC bank accounts. It provided that the EMELEC assets would be sold at auction and delivered to the winning bidder at the auction "free of all liens." Heberling signed the agreement on behalf of PDT, and, although he was also a managing director of LatFin, he did not raise the issue of the existence of the Security Interest. Just over one week later, Heberling entered a new agreement with LatFin, which established a monthly retainer of $120,000 "to be paid until the conclusion of a transaction with respect to EMELEC and to compensate LatFin for past due retainer fees."

After the CONELEC Agreement was signed, PDT decided that it would not sell Electroecuador. As a result, Swett proposed that Pareja enter a new agreement with PDT under which he would be paid lower fees. Such an arrangement was created through a letter of November 12, 2001 (the "November 12 Letter"), which appeared on PDT letterhead and was signed by Heberling, as trustee of PDT. The letter enumerated four "remaining tasks" related to the sale of EMELEC's assets, and invited Pareja to

> participate as a legal and strategic consultant to help us define our positions, and to negotiate the texts of the different documents that will be required, as well as to implement any and all other documents, side agreements, legal actions, and lobbying efforts that will be required to accomplish our objectives.

Again, there was no reference to the Security Interest. Under the November 12 Letter, Pareja was to be paid a monthly retainer of $25,000, an "honoraria" of $100,000 for each of the major agreements to be negotiated, and a success fee of $1,000,000 upon

the successful sale of EMELEC or its assets.

Over the next six months, the plans for the proposed EMELEC sale again began to unravel. The leading potential purchaser dropped out of the process after an agreement had been negotiated. And in May 2002, when the auction was held, only one bid was submitted, and it was incomplete. In light of the failed efforts to sell the assets, Swett and Goldhagen -- with the assistance of Pareja -- began negotiations to turn over the EMELEC and Electroecuador assets to government-run entities. Van Diepen and Heberling did not agree with this course of action, and tension among the four men escalated. In March 2003, Heberling removed Swett as an officer and director of NEPEC, EMELEC, and Electroecuador.

The Electroecuador and EMELEC assets were ultimately never sold, but in July 2003 they were transferred to a local trust organized under Ecuadorian law, which was invested with the power to pay the BP depositors. Although van Diepen and Heberling claim they opposed this arrangement in good faith, the agreements they designed and executed gave them every incentive to delay such a transfer for as long as possible in order to continue to collect their hefty monthly fees. Indeed, by this point, van Diepen had already netted more than $3 million in profit from his role in these events, and the other key players had also been richly compensated. Yet there is no indication that their actions conferred _any_ benefit on the thousands of Ecuadorians who had lost their savings in the collapse of BP. In fact, over

roughly the same period, these depositors received a total of slightly more than $1 million.

Nonetheless, plaintiffs now claim they should have gotten even more out of the failed deal.  They argue that they were never paid the advisory and success fees promised them under the June 2000 letters, and that van Diepen was denied payments for serving on the boards of Northeast Power, EMELEC, and Electroecuador.  They contend that if the Security Interest had been properly recorded, they would have been in a better position to bargain for the money due them.  Defendants suggest that plaintiffs have filed this lawsuit against Swett's friend Pareja in order to coerce Swett to pay them a portion of the profits they believe he has made from the transaction.


CONCLUSIONS OF LAW


Plaintiffs bring claims against Pareja and Pareja y Asociados for breach of contract, breach of fiduciary duty, and professional negligence or malpractice.  As a threshold matter, it is not clear from the complaint whether plaintiffs' claims are made pursuant to New York or Ecuadorian law.  In their pretrial filings, however, plaintiffs suggest that portions of the claims -- in particular, the formation of the attorney-client relationship between plaintiffs and defendants -- should be analyzed under New York law.  Defendants contend that the laws of Ecuador, which they allege has a far greater interest in this

dispute than New York, should be applied.  At the final pretrial
conference held on July 13, plaintiffs consented to the use of
Ecuadorian law to determine the standard of care required of
attorneys.

It is well established that a "federal court exercising
diversity jurisdiction must apply the choice of law analysis of
the forum state."  Beth Israel Medical Center v. Horizon Blue
Cross and Blue Shield of New Jersey, 448 F.3d 573, 582 (2d Cir.
2006) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487,
496 (1941)).  Of course, a court does "not have occasion to
embark on a choice-of-law analysis in the absence of an actual
conflict between the applicable rules of two relevant
jurisdictions."  Finance One Public Co. Ltd. v. Lehman Bros.
Special Financing, Inc., 414 F.3d 325, 331 (2d Cir. 2005)
(citation omitted).  The conflict need not be outcome-
determinative; the jurisdictions must simply provide "different
substantive rules ... relevant to the issue at hand" that would
have a "significant possible effect on the outcome of the trial."
Id. (citation omitted).  Here, the legal standards articulated by
the parties' experts on Ecuadorian law do not differ enough from
New York's standards on the key legal issue -- namely, the
formation of an attorney-client relationship -- to have any
bearing on the outcome.  Indeed, it is all but impossible to
conceive of any standard that would allow for the finding of an
attorney-client relationship between Pareja and plaintiffs under
the facts here.  A choice-of-law analysis is therefore not

warranted.

It is worth noting, however, that even if the choice between New York and Ecuadorian law were relevant to the outcome here, the choice-of-law provision in the April 1 Letter would not be dispositive of the issue, since

> tort claims are outside the scope of contractual
> choice-of-law provisions that specify what law governs
> construction of the terms of the contract, even when
> the contract also includes a broader forum-selection
> clause.

Finance One, 414 F.3d at 335. Here, plaintiffs' primary claim is for legal malpractice, which, in New York is "a species of negligence" -- i.e., a tort. Rubens v. Mason, 387 F.3d 183, 189 (2d Cir. 2004). Although plaintiffs articulate three separate causes of action, all three arise out of a single event -- namely, Pareja's "failure to properly record the Security Interest." Plaintiffs do not claim that Pareja or his firm explicitly promised to record the Security Interest; rather, they argue that their failure to do so constituted a breach of general professional standards. Under such circumstances, New York courts typically view claims for breach of fiduciary duty and breach of contract as duplicative of a legal malpractice claim. Flutie Bros LLC v. Hayes, No. 04 Civ. 4187 (DAB), 2006 WL 1379594, at *7-8 (S.D.N.Y. May 18, 2006) (collecting cases). As a result, the choice of law provision of the April 1 Letter would not be binding here.

I. Malpractice

To prevail on their claim for legal malpractice, the

plaintiffs must show that Pareja and/or Pareja y Asociados entered into an attorney-client relationship with LatFin, and that the recording of the Security Interest fell within the scope of the relationship. If plaintiffs and defendants were never in an attorney-client relationship, or if the relationship did not cover the Security Interest, the claim for malpractice must fail.[3]

A. Existence of an Attorney-Client Relationship

Under New York law, the formation of an attorney-client relationship is governed by contract principles. See <u>C.K. Indus. Corp. v. C.M. Indus. Corp.</u>, 623 N.Y.S.2d 410, 411 (3d Dep't 1995). Although a formal written contract is not necessary, the existence of such a relationship depends upon whether there is contractual privity and a legally binding contract. <u>Id.</u> <u>See also</u> <u>Mason Tenders Dist. Council Pension Fund v. Messera</u>, 4 F.Supp.2d 293, 298 (S.D.N.Y. 1998). The existence of an attorney-client relationship depends on a variety of factors, including:

> 1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal

---

[3] In briefs submitted prior to trial, plaintiffs attempted to argue that, even if no attorney-client relationship was established, they could sue defendants for malpractice on a reliance theory. Van Diepen, however, explicitly disclaimed this theory on the stand. In any event, it would have been rejected, as plaintiffs failed to point to any relevant legal authority to support the proposition that a non-client could hold an attorney liable for negligent representation.

> relationship whereby the attorney performed legal
> services gratuitously; 4) whether the attorney actually
> represented the individual in an aspect of the matter
> (e.g., at a deposition); 5) whether the attorney
> excluded the individual from some aspect of a
> litigation in order to protect another (or a) client's
> interest; 6) whether the purported client believed that
> the attorney was representing him and whether this
> belief was reasonable.

M.J. Woods, Inc. v. Conopco, Inc., 271 F.Supp.2d 576, 585

(S.D.N.Y. 2003) (citation omitted) (applying New York law).  With

respect to the last criterion, New York courts have observed that

"one party's unilateral beliefs and actions do not confer upon

him or her the status of client."  Solondz v. Barash, 639

N.Y.S.2d 561, 564 (3d Dep't 1996).

Based on the evidence introduced by the parties here, it

appears that the criteria for determining the existence of an

attorney-client relationship are similar under Ecuadorian law.

As in New York, no written contract is required[4]; such a

relationship can be established by the lawyer's performance of

services for the client that the parties have agreed to.  Like

any contract, an attorney-client contract can be entered into by

a third party on behalf of another, so long as the third party is

authorized to do so.  In such cases, the contract has the same

effect as if the principal had signed the contract him or

herself.  Here, plaintiffs claim that an attorney-client

relationship between Pareja and/or Pareja y Asociados based on

(1) advice rendered by Pareja prior to April 2001; and (2) the

---

[4] According to defendants' expert, however, a written
contract is required when the value of the goods or services to
be provided exceeds $80.

April 1 Letter.

1. Activities Prior to April 2001

Plaintiffs have not identified a single communication between Pareja and any representative of LatFin prior to April 2001. Plaintiffs have not provided even one piece of competent evidence that would indicate that Pareja was substantively involved in the transaction before April 1. To support their argument, plaintiffs rely on two scraps of testimony -- one of which is wholly inadequate to establish the existence of an attorney-client relationship, and the other of which is entirely incredible.

First, plaintiffs point to Heberling's purported recollection of Swett mentioning Pareja's name early on in the transaction: "From the beginning of my involvement in PDT, Mr. Swett often mentioned his relations with Dr. Pareja, and that he sought and valued Dr. Pareja's advice. I therefore concluded that Mr. Swett was seeking Dr. Pareja's advice in connection with PDT." The notion that Swett could bind Pareja to an attorney-client relationship with LatFin (an entity with which Swett was not affiliated) simply by invoking his name within earshot of Heberling is completely inconsistent with laws of both New York and Ecuador. In any event, Swett's testimony that he first consulted Pareja on behalf of PDT in the spring of 2001 was entirely credible and consistent with the circumstantial

evidence.[5]

Second, plaintiffs rely on van Diepen's claim that he discussed the Security Interest with Pareja before he signed it in January 2001. Van Diepen was thoroughly vague as to the circumstances in which this alleged conversation occurred. Moreover, this testimony is uncorroborated by any other witness and is not supported by a single document. This is perhaps unsurprising, given Van Diepen's utter lack of credibility on the witness stand: On multiple occasions, he directly contradicted his prior sworn testimony and refused to acknowledge the discrepancies; he made claims during cross-examination that, if they had been true, would certainly have been included in his declaration; he made broad and vague assertions about Pareja without any documents to confirm them; and he advanced claims that were thoroughly rebutted by credible witnesses.[6] In short, he showed himself to have little regard for the oath he took as a

_____

[5] Moreover, the credibility of Heberling's testimony is severely compromised by the fact that, on the eve of his deposition in this case, he entered into an agreement with van Diepen to share in any recovery from this lawsuit.

[6] Among the most egregious examples of van Diepen's dissembling were: (1) his claim at his deposition that he remembered Pareja being present in Florida when the Security Interest was signed, before being shown conclusive evidence demonstrating that Pareja was in Ecuador at the time; (2) his statement at trial that he discussed the Security Interest with Pareja between its signing and September 2003, despite having previously testified under oath that "nothing was said" about the Security Interest during that period, and despite the fact that he failed to mention these alleged conversations in his declaration; and (3) his claim that LatFin was owed substantially more than a 1% termination fee for the transaction, despite having signed a form indicating that the 1% fee was the only contingent payment left to be made to the firm.

19

witness and to be unworthy of the Court's trust. Therefore, van Diepen's vague assertion that he spoke with Pareja before signing the Security Interest will not be credited.

2. The April 1 Letter

The April 1 Letter established an attorney-client relationship between PDT and Pareja, not between LatFin and Pareja. Indeed, the Letter stated this directly: Pareja was to "be retained as outside legal counsel to PDT." LatFin therefore served only as an agent, not a party to the agreement. Again, the Letter could not have been more clear on this point: LatFin offered to "engage [Pareja] on behalf of PDT."

In support of their position, plaintiffs highlight only two sentences in the three-page letter. First, they point to the statement early in the letter that, "LatFin agrees that engaging independent counsel in Ecuador is essential to the success of the transaction and the security of LatFin's rights." Standing alone, this sentence does not create any contractual relationship between Pareja and LatFin. Read in context, it meant only that LatFin believed that if PDT had competent Ecuadorian counsel, the sale of assets was more likely to be accomplished, and LatFin was therefore more likely to receive its success fee. It did not, however, mean that LatFin was hiring Pareja as its lawyer.

Second, plaintiffs point to the last of the twelve listed "legal services" that Pareja was contracting to provide -- namely, "all such other assignments as may from time to time be

required by the Companies, LatFin or PDT." Given that elsewhere in the letter, LatFin was described as "represent[ing]" PDT and securing Pareja's services "on behalf of PDT," it would have been clear that LatFin would only be giving Pareja assignments as an agent of PDT. The Letter provides no basis for concluding that LatFin would be able to use Pareja's services for any other purpose. Therefore, the April 2001 Letter does not evidence the formation of an attorney-client relationship between LatFin and Pareja.

In addition to failing to show a written contract between Pareja and van Diepen or LatFin, plaintiffs have also not established any of the other possible criteria for creation of an attorney-client relationship under either New York or Ecuadorian law.[7] There is no indication that Pareja performed work for LatFin, as opposed to PDT. Nor does it appear that Pareja or LatFin thought that he was their lawyer. Indeed, plaintiffs have not pointed to any contemporaneous statements by Pareja or van Diepen that would suggest that either party believed that they were attorney and client. Van Diepen did not even meet Pareja until eight months after the April 2001 Letter was signed. Evidence of an attorney-client relationship between Pareja and plaintiffs therefore is not just inadequate; it's non-existent.[8]

---

[7] In fact, in his summation, plaintiffs' counsel pointed to nothing other than the April 1 Letter to show the formation of the relationship.

[8] Because plaintiffs' malpractice claim against Pareja y Asociados is based on precisely the same facts, it fails as well. It is worth noting, however, that even if an attorney-client

B. Scope of the Relationship

Even if plaintiffs were able to demonstrate that Pareja was serving as their lawyer, they have utterly failed to show that he had <u>any duty at all</u> with regard to the Security Interest. As noted above, it was drafted and filed by other lawyers before Pareja was even retained by PDT. They testified that Pareja had no role in these events. Furthermore, even though the Security Interest existed at the time of the April 1 Letter, the agreement contained no mention of it. Plaintiffs have not identified any request they or anyone else made of Pareja with respect to the Security Interest. In fact, van Diepen admitted that once the Security Interest was signed, he considered it "put to bed," and as a result, had no discussions about it with anyone until mid-to-late 2003.

Nonetheless, plaintiffs make two unavailing attempts to show that Pareja had responsibilities with respect to this document.

_____

relationship had been established between Pareja and van Diepen or LatFin, that relationship would not have included Pareja's firm. First, plaintiffs submitted <u>no</u> evidence that Pareja y Asociados was involved in the events at issue, or that the parties understood Pareja to have signed either letter on behalf of his firm. Second, plaintiffs' and defendants' experts on Ecuadorian law agree that no cause of action for malpractice can be maintained against Pareja y Asociados -- albeit on two different grounds. Plaintiffs' expert states that according Ecuadorean law, "Law firms are not attorneys and therefore no professional relationship could be established with the firm." Defendants' expert notes that under Article 1998 of Ecuador's Civil Code, a "partner making business under its own name and not on behalf of the partnership does not oblige the partnership ... Furthermore, in case of doubt, it is understood that the partner acts on his own."

First, they point to an e-mail of July 2002 from Hernandez to
Swett on which Pareja was copied.  Hernandez raised three
questions regarding comments Swett had made on a draft agreement
for the transfer of the EMELEC and Electroecuador assets, only
one of which pertained to the Security Interest.  Hernandez,
however, requested Pareja's advice on a separate issue, and
explicitly stated that it was for this reason alone that Pareja
was a recipient of the message.  Second, they point to one
version of this draft agreement, which Pareja apparently
received, that contains a parenthetical comment written by Swett
that, "Peter [Heberling] and LatFin have secured interest on all
of [EMELEC's] assets."  There is no evidence, however, that the
note was directed at Pareja, or that it could have been
reasonably interpreted as soliciting legal advice from Pareja.[9]

Plaintiffs <u>were</u> receiving legal advice about the Security
Interest, but it was from a different source.  In a sworn
statement given in a related arbitration earlier this year, van
Diepen admitted that when it came to the Security Interest,
LatFin was represented by the Miami office of Hunton & Williams.
When asked directly whether he or LatFin had Ecuadorian counsel

---

[9] Plaintiffs' additional claim that Pareja actually <u>did</u>
check for the existence of liens in connection with the transfer
of assets is not relevant to the question of whether ensuring the
validity of the Security Interest was within the scope of his
employment agreement.  In any event, Pareja testified that he
relied on EMELEC, Electroecuador, and AGD to inform him of such
encumbrances.  Furthermore, because the Security Interest was
not, in fact, properly recorded, it is not clear that it would
have been uncovered in a search for liens against the companies'
assets.

working on the Security Interest, he said they "did not."  Van
Diepen also testified that he understood the Security Interest to
be governed by Florida law, which led him to consult with the
Miami law firm.

Perhaps most tellingly, when it came time for plaintiffs to
use the Security Interest to attempt to collect their fees, they
did not involve Pareja in the discussions.  On July 17, 2003, van
Diepen sent an e-mail addressed to Goldhagen stating in part "I
expect to be paid in full within the next week or I will enforce
the security interest in Emelec that was given to the Latin
America finance group."  Although van Diepen copied a lawyer from
Hunton & Williams on the message, he did not copy Pareja.  To the
extent that van Diepen believed that there were lawyers
representing him with respect to the Security Interest, then,
Pareja was simply not among them.  Plaintiffs have not pointed to
any legal standard, whether from New York or Ecuador, that would
suggest that a lawyer could be held liable for tasks he was not
retained to perform.  Plaintiffs' claim for malpractice is
rejected.[10]

_____

[10] Plaintiffs' malpractice claim is, in fact, so far off the
mark, that it is difficult to believe that this litigation was
ever truly about Pareja's performance as a lawyer.  It appears
instead to have been born of deep-seated personal animosity
between van Diepen and Heberling on the one hand, and Swett and
Goldhagen on the other.  Whatever the merits of van Diepen and
Heberling's position in that dispute, it is wholly irrelevant to
the legal issues implicated here -- a critical point that
plaintiffs repeatedly seemed to forget at trial.  Much of
plaintiffs' cross-examination of defense witnesses had nothing to
do with Pareja, his firm, or the Security Interest.  Plaintiffs
seemed more interested in impugning the motives, tactics, income,
and spending habits of Swett and his associates.  And in his

II. Breach of Contract

As explained above, it was PDT, rather than LatFin, that retained Pareja through the April 1 Letter.  No contract between LatFin or van Diepen on the one hand and Pareja or Pareja y Asociados on the other was ever established.  Beyond that, to the extent a contractual relationship existed, Pareja had no duty to perform in connection with the Security Interest.  Therefore, the breach of contract claim fails.


III. Breach of Fiduciary Duty

Plaintiffs do not fully explain how they believe Pareja was invested with a fiduciary duty to LatFin and/or van Diepen.  They have provided no basis in Ecuadorian law for this claim.  And, as noted above, to the extent this claim is brought under New York law, it is duplicative of the legal malpractice claim, which has been rejected.  Even if plaintiffs were somehow able to articulate a separate claim for breach of fiduciary duty, it would fail based on the facts they have submitted.  "As a general rule in New York, a lawyer has no duty of care to third parties." Pope v. Rice, No. 04 Civ. 4171 (DLC), 2005 WL 613085, at *10 (S.D.N.Y. Mar. 14, 2005) (citation omitted).  The only exceptions to this rule arise "in cases of fraud or other malicious acts ...

---

summation, plaintiffs' counsel appeared to refer to Swett as a defendant, despite his not actually being a party to the litigation.  If, as seems to be the case, plaintiffs' true dispute was with Swett, rather than Pareja, it becomes even clearer that this lawsuit was filed in bad faith.

or where there is a relationship so close as to approach that of privity." Id. at *11 (citation omitted). Neither of these exceptions is applicable here. Therefore, plaintiffs' claim for breach of fiduciary duty is rejected.

## Conclusion

For the foregoing reasons, each of plaintiffs claims is dismissed in its entirety. The Clerk of Court shall enter judgment for defendants and close the case.

SO ORDERED:

Dated: New York, New York
July 19, 2006

_____
DENISE COTE
United States District Judge